STATE OF CONNECTICUT *v.* BURTON E. MERRITT
(12377)

DUPONT, C. J., and SCHALLER and SPEAR, Js.

Argued March 30—decision released July 29, 1994

*Conrad Ost Seifert,* for the appellant (defendant).

*Leon F. Dalbec, Jr.,* assistant state's attorney, with whom, on the brief, were *C. Robert Satti, Sr.,* state's attorney, and *Mary Jean Kanabis,* assistant state's attorney, for the appellee (state).

SCHALLER, J. The defendant appeals from the judgment of conviction, rendered after a jury trial, of operating a motor vehicle while under the influence of intoxicating liquor in violation of General Statutes § 14-227a (a) (1).[1] The defendant claims that the trial

[1] General Statutes § 14-227a provides in pertinent part: "(a) OPERATION WHILE UNDER THE INFLUENCE. No person shall operate a motor vehicle while under the influence of intoxicating liquor or any drug or both. A person commits the offense of operating a motor vehicle while under the influence of intoxicating liquor or any drug or both if he operates a motor vehicle on a public highway of this state . . . (1) while under the influence of intoxicating liquor or any drug or both . . . ."

court improperly (1) permitted testimony concerning the results of a horizontal gaze nystagmus (HGN) test without requiring that the state meet the criteria for the admission of scientific evidence as set forth in *Frye* v. *United States,* 293 F. 1013 (D.C. Cir. 1923), and (2) instructed the jury regarding consciousness of guilt on the basis of the defendant's refusal to submit to a breath test. We affirm the judgment.

The jury reasonably could have found the following facts. Early in the morning of February 22, 1992, Officer Matthew Roland of the East Lyme police department was on patrol on Route 156. The defendant, while driving a pickup truck, failed to obey a stop sign and made a left turn onto Route 156, almost colliding with the side of Roland's cruiser. Roland swerved to avoid an accident, and subsequently followed the defendant's vehicle to stop him for failure to obey a traffic sign. Because there were several people in the bed of the defendant's pickup truck, Roland requested backup assistance before pulling over the vehicle. When assistance arrived, Roland pulled over the defendant's vehicle and issued him a ticket for failing to stop at the stop sign.

Roland suspected that the defendant was intoxicated, as his breath smelled of alcohol, his eyes were bloodshot, his clothes were disheveled, he was swaying back and forth, and he spoke slowly. Officer Joseph Dunn, who was assisting Roland at the scene, also noticed that the defendant's breath smelled of alcohol, his face was flushed, he was swaying back and forth, and he appeared to be experiencing difficulty in comprehending instructions. The defendant testified that during the eight hour period prior to Roland's pulling him over, he had consumed four mixed drinks.

Roland conducted three field sobriety tests. He first asked the defendant to recite the alphabet. The defend-

ant skipped letters "U" and "V." Roland next required that the defendant walk in a straight line, heel to toe, with his hands at his sides, for ten steps, and then pivot and return. The defendant staggered when taking the steps, stopped at one point, and raised his arms to maintain his balance. Finally, Roland instructed the defendant to stand straight with his arms at his side and raise either leg six inches off the ground for a thirty count. The defendant had to put his foot down on counts twenty and twenty-eight.

Dunn then conducted a HGN test, in which he made three separate observations of the reactions of each of the defendant's eyes to certain stimuli. On the basis of all his observations, including those derived from the HGN test, Dunn testified that, in his opinion, the defendant had a blood alcohol level well above the legal limit.

Upon the completion of the sobriety tests, Roland prepared to transport the defendant to the state police barracks in Montville. Roland radioed the barracks to determine if it had an operational breath testing machine. The barracks did not have a functioning machine, and the defendant was transported instead to the Jewett City police department. After unsuccessfully trying to contact his attorney, the defendant refused to take a breath test. Additional facts will be set forth as necessary.

## I

## A

### REVIEWABILITY

In assessing the defendant's claim regarding the applicability of the standard enunciated in *Frye* v. *United States,* supra, 293 F. 1013,[2] we first examine

---

[2] In *Moore* v. *McNamara,* 201 Conn. 16, 20, 513 A.2d 660 (1986), our Supreme Court expressly approved the use of the *Frye* test with regard

whether the defendant properly preserved this issue for appeal. On direct examination, Dunn testified to the general nature of the HGN test. He explained that he conducted the HGN test by placing an object approximately fifteen inches in front of a suspect's nose, moving it from side to side, and observing the reactions of the particular eye being tested in the following three respects: (1) whether the eye exhibited a "smooth pursuit" of the object from the center of the defendant's face to a point at which the object could no longer be seen; (2) whether the eye was bouncing or still at the point at which the object could no longer be seen, namely, the "maximum deviation"; and (3) whether the eye began moving or bouncing involuntarily at a point prior to forty-five degrees as the object moved toward maximum deviation.

When Dunn stated that involuntary movement of an eye prior to forty-five degrees would indicate "more than likely that [an individual is] 0.1 or above—," the defendant objected, but before the trial court's ruling, Dunn finished his statement with "—above the legal limit." Defense counsel explained his objection by stat-

---

to evidence derived from innovative scientific techniques, requiring proof of the general acceptance of such techniques in the scientific community, and in *State* v. *Hasan,* 205 Conn. 485, 490, 534 A.2d 877 (1987), and *State* v. *Borelli,* 227 Conn. 153, 629 A.2d 1105 (1993), the court clarified the circumstances under which the *Frye* doctrine applies. We note that in *Daubert* v. *Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 471 (1993), the United States Supreme Court held that with regard to all *federal* cases, the test for the admissibility of scientific evidence set forth in the Federal Rules of Evidence superseded the test set forth in *Frye.* Federal Rule of Evidence 702 provides in pertinent part: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." In *State* v. *Borelli,* supra, 163 n.10, our Supreme Court recognized the tension between the tests set forth in *Frye* and rule 702 of the Federal Rules of Evidence, but stated that it need not address the issue of the continued validity of the *Frye* test in Connecticut at that time. We, likewise, do not address the issue at this time.

ing that Dunn was testifying to an opinion, and requested voir dire regarding Dunn's qualifications. The state countered that Dunn was merely testifying to generalities regarding the framework of the test, and the court overruled the objection.

Dunn then testified as to his particular observations when conducting the HGN test on the defendant. He stated that both eyes lacked smooth pursuit, and, that at the point of maximum deviation, the eyes exhibited a distinctive twitching or involuntary movement that commenced prior to forty-five degrees. The prosecutor then asked the following question: "Based on the defendant's performance on this test, did you form an opinion as to his sobriety?" Defense counsel objected at this point, and a lengthy voir dire occurred outside the presence of the jury.

During the voir dire, Dunn testified that he did not have a medical degree, and that he did not know the scientific formula to convert the results of the HGN test to a finding regarding an individual's specific blood alcohol content. Moreover, he could not identify a scientific journal or book that determines the accuracy of the HGN test. Defense counsel then stated that "under the *Frye* criteria . . . I would submit . . . that [Dunn is] not qualified to testify as an expert on the opinion of whether [the defendant] was under the influence . . . . *Frye* says that [r]egarding evidence derived from innovative scientific techniques there has to be proof that there's general acceptance by the scientific community. [See id., 1014.]"

In essence, the defendant objected to the state presenting opinion evidence that the results of the HGN test indicated that the defendant was under the influence. The defendant did not object when Dunn described the mechanics of the HGN test, but did object

that a proper foundation had not been supplied for an opinion on the bases of the HGN test results. We conclude that the defendant timely objected to the admissibility of Dunn's testimony on the ground that the *Frye* test had not been met with regard to the HGN test and its results. Accordingly, we will review his claim.

## B

### HORIZONTAL GAZE NYSTAGMUS TEST

We apply the following standard of review for evidentiary matters: "The trial court has wide discretion in its rulings on evidence and its rulings will be reversed only if the court has abused its discretion or an injustice appears to have been done. *State* v. *Boles,* 223 Conn. 535, 549, 613 A.2d 770 (1992)." *State* v. *Robinson,* 227 Conn. 711, 732, 631 A.2d 288 (1993). The question here is whether the trial court improperly ruled that Dunn could testify to his opinion based in part on the HGN test results, without requiring that the HGN test meet the *Frye* standard for the admission of scientific evidence.

In *Frye,* the court set forth a special rule for the admission of testimony regarding scientific evidence. The court stated that "[j]ust when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained *general acceptance in the particular field in which it belongs.*" (Emphasis added.) *Frye* v. *United States,* supra, 293 F. 1014.[3]

---

[3] Although the court in *Frye* did not elaborate on the standard of general acceptance in the scientific community, various jurisdictions have refined the test to incorporate the indicia of reliability. For example, the

Our Supreme Court has held that the *Frye* standard does not apply to all types of scientific evidence. In holding that the *Frye* test is "not a necessary precondition for the admission of expert testimony on battered woman's syndrome"; *State* v. *Borelli*, 227 Conn. 153, 165, 629 A.2d 1105 (1993); the court stated that it "does not apply the *Frye* test to all types of expert testimony, even if technical or scientific concepts are involved. In *State* v. *Hasan*, [205 Conn. 485, 489, 534 A.2d 877 (1987)], [our Supreme Court] noted that [it had] previously applied the *Frye* test to 'innovative scientific techniques . . . [including] polygraph testing . . . and human leukocyte antigen testing for paternity.' (Citations omitted.) See *State* v. *McClary*, 207 Conn. 233, 246, 541 A.2d 96 (1988) (finding that shaken baby syndrome is a diagnosis generally accepted in the medical field); *State* v. *Tomanelli*, 153 Conn. 365, 370, 216 A.2d 625 (1966) (applying the *Frye* test to the use of police radar). [The court has] found the *Frye* test appropriate when the experimental, mechanical or theoretical nature of the scientific evidence had the 'potential to mislead lay jurors awed by an aura of mystic infallibility surrounding scientific techniques, experts and the fancy devices employed.' (Internal quotation marks omitted.) *State* v. *Hasan*, supra, 490.

Court of Appeals of New York has stated that " 'the test is not whether a particular procedure is unanimously indorsed by the scientific community, but whether it is generally accepted as reliable.' " *People* v. *Quinn*, 153 Misc. 2d 139, 151, 580 N.Y.S.2d 818 (1991), quoting *People* v. *Middletown*, 54 N.Y.2d 42, 50, 429 N.E.2d 100, 444 N.Y.S.2d 581 (1981); see also *State* v. *Witte*, 251 Kan. 313, 329–30, 836 P.2d 1110 (1992); *Commonwealth* v. *Apollo*, 412 Pa. Super. 453, 460, 603 A.2d 1023 (1992). While our Supreme Court has never explicitly adopted a statement of *Frye* that includes reference to the reliability of the scientific test or procedure, it has, in essence, affirmed that relationship. In *State* v. *Hasan*, 205 Conn. 485, 490, 534 A.2d 877 (1987), the court stated that "[t]he fact that a technique or method has gained general acceptance in the scientific community to which it belongs tends to ensure that the jury will not accord undue weight to the theories whose validity has not been adequately tested. *People* v. *Kelly*, [17 Cal. 3d 24, 31–32, 549 P.2d 1240, 130 Cal. Rptr. 144 (1976)]."

"Nevertheless, expert testimony need not satisfy the *Frye* test in cases where 'the jury is in a position to weigh the probative value of the testimony without abandoning common sense and sacrificing independent judgment to the expert's assertions based on his special skill or knowledge. . . . Furthermore, where understanding of the method is accessible to the jury, and not dependent on familiarity with highly technical or obscure scientific theories, the expert's qualifications, and the logical bases of his opinions and conclusions can be effectively challenged by cross-examination and rebuttal evidence.' (Citation omitted.) Id., 491." *State* v. *Borelli,* supra, 227 Conn. 163–64.

Nystagmus is "[a]n abnormal and involuntary movement of the eyeballs from side to side or up and down, but usually from side to side. It is a sign of a number of ailments, usually of a nervous origin. It may, however, be due to simple fatigue of the eye muscles, as when watching a tennis game." 3 J. Schmidt, Attorneys' Dictionary of Medicine (1993); see T. Stedman, Medical Dictionary (25th Ed. 1990). "The theory behind the [HGN] test is that there is a strong correlation between the amount of alcohol a person consumes and the angle of onset of the nystagmus. Carper & McCamey, [Gaze Nystagmus: Scientific Proof of DUI?, 77 Ill. B.J. 146, 147 (1988)]; see Whitmore, Roadside Sobriety Tests: A Police Officers' Guide to Making Drunk Driving Arrests Stand Up in Court § 5:05 (1987)." *State* v. *Witte,* 251 Kan. 313, 316, 836 P.2d 1110 (1992).

Here, Dunn, in his testimony regarding the mechanics of the HGN test, explained that the administration of the test requires no special equipment. Dunn stated that he instructed the defendant to keep his head stationary and to follow Dunn's thumb as he moved it from side to side. As noted above, Dunn observed the reactions of each of the defendant's eyes

with regard to three criteria—whether each eye maintained a smooth pursuit of Dunn's thumb, whether each eye exhibited nystagmus at the point of maximum deviation, and whether the angle of onset of the nystagmus occurred at a point prior to forty-five degrees.

Dunn's testimony further reinforces the correlation between the angle of onset and incidence of nystagmus and alcohol consumption. Dunn explained that with regard to the second test, or maximum deviation, "[t]he effects of alcohol will make the eye bounce more as it's going out to that maximum deviation point, and then when it gets there, it will start jerking and twisting." Concerning the third part of the test, the angle of onset of nystagmus, Dunn stated that "if [the nystagmus] is prior to forty-five degrees, more than likely they're 0.1 or above . . . the legal limit." Dunn, therefore, asserted that a connection existed between the angle of onset of nystagmus, as well as the incidence of nystagmus, and alcohol consumption, but also acknowledged that several factors unrelated to alcohol consumption could impact the results of the test.

Our appellate courts have never determined whether the HGN test and its results are the type of scientific evidence that requires a special foundation for the admission of testimony concerning those matters.[4]

---

[4] In reciting the relevant facts in *State* v. *Stevens,* 224 Conn. 730, 733 n.5, 733–34, 620 A.2d 789 (1993), the court refers to the HGN test and notes that an officer administered an HGN test and utilized the results, along with other observations, to draw the conclusion that the defendant was intoxicated. *Stevens* focused on the authority of police officers from Stonington to gather evidence in Rhode Island regarding the defendant's intoxication. The question of the admissibility of the HGN test and its results on the grounds that they constituted scientific evidence was neither raised nor reviewed.

We also note our opinion in *State* v. *Royce,* 29 Conn. App. 512, 616 A.2d 284 (1992). In *Royce,* the trial court granted the defendant's motion to suppress the results of a blood alcohol test on the ground that the officer did not have probable cause to arrest the defendant. Id., 513. The HGN test and its results comprised part of the state's evidence in support of its asser-

Courts in numerous other jurisdictions, however, have addressed this issue. Review of these decisions reveals that the majority has concluded that an underlying scientific proposition is involved in the HGN test. See *State* v. *Superior Court, County of Cochise,* 149 Ariz. 269, 718 P.2d 171 (1986); *People* v. *Leahy,* 22 Cal. App. 4th 1109, 22 Cal. Rptr. 2d 322 (1993); *State* v. *Gleason,* 123 Idaho 62, 844 P.2d 691 (1992); *State* v. *Garrett,* 119 Idaho 878, 811 P.2d 488 (1991); *People* v. *Buening,* 229 Ill. App. 3d 538, 592 N.E.2d 1222 (1992); *State* v. *Witte,* supra, 251 Kan. 313; *State* v. *Armstrong,* 561 So. 2d 883 (La. App. 1990); *State* v. *Hill,* 865 S.W.2d 702 (Mo. App. 1993); *State* v. *Clark,* 234 Mont. 222, 762 P.2d 853 (1988); *State* v. *Borchardt,* 224 Neb. 47, 395 N.W.2d 551 (1986); *People* v. *Erickson,* 156 App. Div. 2d 760, 549 N.Y.S.2d 182 (1989); *People* v. *Quinn,* 153 Misc. 2d 139, 580 N.Y.S.2d 818 (1991); *Fargo* v. *McLaughlin,* 512 N.W.2d 700 (N.D. 1994); *Yell* v. *State,* 856 P.2d 996 (Okla. Crim. App. 1993); *State* v. *O'Key,* 123 Or. App. 54, 858 P.2d 904 (1993); *Commonwealth* v. *Moore,* 430 Pa. Super. 575, 635 A.2d 625 (1993); *Commonwealth* v. *Apollo,* 412 Pa. Super. 453, 603 A.2d 1023 (1992); *Commonwealth* v. *Miller,* 367 Pa. Super. 359, 532 A.2d 1186 (1987); *Howard* v. *State,* 744 S.W.2d 640 (Tex. Crim. App. 1987); *Emerson* v. *State,* 880 S.W.2d 759 (Texas Crim. App. 1994); *State* v.

tion that probable cause existed to arrest the defendant. Id., 515. At the hearing on the motion to suppress, the defendant introduced expert testimony concerning the reliability of the HGN test. Id. This court concluded, however, that "[t]he issue of the validity of the horizontal gaze nystagmus test, including whether the condition resulted from some congenital defect or from the defendant's ingestion of alcohol, may be relevant when the issue of the defendant's guilt or lack thereof is determined. It is not, however, a proper issue to be used to negate the existence of probable cause when the evidence is examined from the viewpoint of the knowledge of the arresting officer. See [*State* v. *Martin,* 2 Conn. App. 605, 612B, 482 A.2d 70 (1984), cert. denied, 195 Conn. 802, 488 A.2d 457, cert. denied, 472 U.S. 1009, 105 S. Ct. 2706, 86 L. Ed. 2d 721 (1985)]." Id., 518.

*Cissne,* 72 Wash. App. 677, 865 P.2d 564 (1994); *State v. Barker,* 179 W. Va. 194, 366 S.E.2d 642 (1988).

Courts in a minority of jurisdictions have concluded that the HGN test does not involve scientific principles, and, therefore, neither the criteria set forth in *Frye* nor the appropriate state rule of evidence concerning scientific evidence must be met for admission. See *Whitson* v. *State,* 314 Ark. 458, 863 S.W.2d 794 (1993); *State* v. *Murphy,* 451 N.W.2d 154 (Iowa 1990); *State* v. *Bresson,* 51 Ohio St. 3d 123, 554 N.E.2d 1330 (1990); *State* v. *Nagel,* 30 Ohio App. 3d 80, 506 N.E.2d 285 (1986); *State* v. *Sullivan,* 310 S.C. 311, 426 S.E.2d 766 (1993). These cases suggest that the HGN test is simply not a scientific test.[5] Rather, the HGN test is comparable to other field sobriety tests that do not require further scientific foundation for admission. The Ohio Court of Appeals has noted that the HGN test "is not comparable . . . to a polygraph test which requires the use of a machine, the scientific reliability of which may be questioned. The gaze nystagmus test, as do other commonly used field sobriety tests, requires only the personal observation of the officer administering it. It is objective in nature and does not require expert

---

[5] In *State* v. *Bresson,* supra, 51 Ohio St. 3d 128, the court stated: "We find that the HGN test has been shown to be a reliable indicator of [blood alcohol] levels." "The trial court has broad discretion in admitting evidence based on scientific processes." Id., 129. "The HGN test cannot be compared to other scientific tests, such as a polygraph examination, since no special equipment is required in its administration." Id. "The admission of the results of the HGN test is no different from any other field sobriety test . . . ." Id. Although the court did not state directly that the HGN test does not represent scientific evidence, the tone of the opinion suggests that intention.

In *State* v. *Sullivan,* supra, 310 S.C. 315, the court cited to *State* v. *Nagel,* supra, 30 Ohio App. 3d 80, regarding the comparison of the HGN test to other field sobriety tests. Although the court appeared to assert that the HGN test did not involve scientific evidence, the court failed to state that proposition explicitly.

interpretation. Objective manifestations of insobriety, personally observed by the officer, are always relevant where, as here, the defendant's physical condition is in issue." *State* v. *Nagel, supra,* 80.

Of the majority of states that do consider the HGN test and its results as scientific evidence, several appellate courts have further determined that the HGN test meets the criteria for admissibility set forth in *Frye*[6] or the pertinent state rule of evidence.[7] In general, these jurisdictions have recognized that there is an underlying scientific proposition involved in the HGN test, namely, that alcohol consumption correlates to the increased incidence of and the angle of onset of nystagmus, and have determined, upon review of relevant case law and scientific publications, that the HGN test is a reliable indicator of intoxication. See, e.g., *Fargo* v. *McLaughlin, supra,* 512 N.W.2d 706.

Other courts have determined that a trial court, not an appellate court, provides the correct forum for the initial determination as to whether the criteria set forth

[6] See *State* v. *Superior Court, County of Cochise, supra,* 149 Ariz. 269; *State* v. *Garrett, supra,* 119 Idaho 878 (in *State* v. *Gleason, supra,* 123 Idaho 62, the court reaffirmed the principles set forth in *Garrett,* but also noted that the proper standard for the admission of scientific evidence is found in rule 702 of the Idaho Rules of Evidence, which corresponds to rule 702 of the Federal Rules of Evidence); *People* v. *Buening, supra,* 229 Ill. App. 3d 538; *State* v. *Armstrong, supra,* 561 So. 2d 883; *Fargo* v. *McLaughlin, supra,* 512 N.W.2d 700; *Howard* v. *State, supra,* 744 S.W.2d 640 (subsequent to *Howard,* Texas developed a test for the admission of novel scientific evidence in accord with rule 702 of the Federal Rules of Evidence, and the Texas Court of Criminal Appeals addressed this issue under the standard set forth in rule 702 in *Emerson* v. *State, supra,* 880 S.W.2d 763–64).

[7] Various jurisdictions have examined the matter under the standard set forth in a state rule of evidence that is identical to rule 702 of the Federal Rules of Evidence. See *State* v. *Gleason, supra,* 123 Idaho 62 (reaffirming decision in *State* v. *Garrett, supra,* 119 Idaho 878, but noting that proper standard for admission is rule of evidence that corresponds to rule 702 of the Federal Rules of Evidence); *State* v. *Clark, supra,* 234 Mont. 222; *State* v. *O'Key, supra,* 123 Or. App. 54; *Emerson* v. *State, supra,* 880 S.W.2d 763 (HGN test and results are helpful and reliable).

in *Frye*[8] or the appropriate state rule of evidence[9] has been satisfied. These jurisdictions have generally concluded that the general acceptance of the HGN test is not a foregone conclusion. The Supreme Court of Kansas, for example, has stated that "[t]he reliability of the HGN test is not currently a settled proposition in the scientific community. . . . HGN evidence requires a *Frye* foundation for admissibility. If the *Frye* foundation is established to this court's satisfaction, HGN evidence will be admitted in other cases without the need to satisfy the *Frye* test each time. Before this court rules on whether HGN evidence satisfies *Frye* admissibility requirements, a trial court first should have an opportunity to examine, weigh, and decide disputed facts to determine whether the test is sufficiently reliable to be admissible for any purpose in Kansas." *State* v. *Witte,* supra, 251 Kan. 329–30; see also *State* v. *Cissne,* supra, 865 P.2d 569 (trial court must determine whether HGN test "is reliable as an indicator of the probability of impairment or specific blood alcohol level"). In *Witte,* the court stressed that research that indicated a high incidence of false positive results, as well as a variety of conditions unrelated to alcohol consumption that could cause nystagmus,

---

[8] See *People* v. *Leahy,* supra, 22 Cal. App. 4th 1109; *State* v. *Witte,* supra, 251 Kan. 313; *People* v. *Erickson,* supra, 156 App. Div. 2d 760; *State* v. *Cissne,* supra, 865 P.2d 564; *State* v. *Barker,* supra, 179 W. Va. 194.

In other cases, appellate courts have reviewed trial court determinations concerning the admission of HGN tests and have held that the state did not lay the proper foundation for admission pursuant to *Frye.* See *Yell* v. *State,* supra, 856 P.2d 996; *Commonwealth* v. *Moore,* supra, 430 Pa. Super. 575; *Commonwealth* v. *Apollo,* supra, 412 Pa. Super. 453; *Commonwealth* v. *Miller,* supra, 367 Pa. Super. 359. In at least two cases, appellate courts concluded that the state had laid a proper foundation pursuant to *Frye.* See *State* v. *Hill,* supra, 865 S.W.2d 702; *People* v. *Quinn,* supra, 153 Misc. 2d 139.

[9] In *State* v. *Borchardt,* supra, 224 Neb. 47, the court concluded that, pursuant to Nebraska's rule of evidence corresponding to rule 702 of the Federal Rules of Evidence, the state had not produced any evidence at trial that the HGN test was valid.

rendered the accuracy of the HGN test with regard to alcohol consumption an uncertain proposition. *State* v. *Witte,* supra, 330–31.

Finally, we note that the majority of jurisdictions that grant the admission into evidence of the HGN test and its results allow the test and results only as evidence of intoxication, rather than conclusive proof of intoxication.[10] The Appellate Court of Illinois, for example, has stated that "[a]lthough we also sanction the use of HGN test evidence to corroborate or attack chemical analysis of an accused's blood-alcohol content, we are not saying that such evidence may be used to quantify it, in other words, utilized to *establish* a defendant's [blood alcohol content] in the absence of a chemical analysis of the defendant's blood, breath, or urine." (Emphasis added.) *People* v. *Buening,* supra, 229 Ill. App. 3d 538.

On the basis of our review of the record, and in accord with the majority of jurisdictions that have addressed this issue, we conclude that the HGN test and its results are based on a scientific principle, namely, that there is a discernable correlation between the increased incidence of and the angle of the onset of nystagmus and alcohol consumption. The mechanics of the HGN test, we further conclude, unlike those of other field sobriety tests that probe an individual's sense of balance, his coordination and his abilities to comprehend and follow instructions are not within the common knowl-

---

[10] See *Whitson* v. *State,* supra, 314 Ark. 458; *State ex. rel. Hamilton* v. *City Court of Mesa,* 165 Ariz. 514, 799 P.2d 855 (1990); *State* v. *Superior Court, County of Cochise,* supra, 149 Ariz. 269; *State* v. *Gleason,* supra, 123 Idaho 62; *State* v. *Garrett,* supra, 119 Idaho 878; *People* v. *Buening,* supra, 229 Ill. App. 3d 538; *State* v. *Armstrong,* supra, 561 So. 2d 883; *State* v. *Hill,* supra, 865 S.W.2d 702; *Fargo* v. *McLaughlin,* supra, 512 N.W.2d 700; *State* v. *Bresson,* supra, 51 Ohio St. 3d 123; *State* v. *Sullivan,* supra, 426 S.E.2d 769; *Emerson* v. *State,* supra, 880 S.W.2d 759; *Anderson* v. *State,* 866 S.W.2d 685 (Tex. App. 1993); *Howard* v. *State,* supra, 744 S.W.2d 643; *State* v. *Barker,* supra, 179 W. Va. 194.

edge of lay jurors. The reasons underscoring the nature of the HGN test are unfamiliar to jurors, and a juror would not be in a position to weigh the testimony concerning the HGN test and its results without abandoning common sense and sacrificing independent judgment to the expert's assertions, which are based on understanding the technical aspects of the test. The scientific and theoretical nature of the HGN test and its results has the potential to mislead jurors in the absence of a foundation establishing the general acceptance of the test. The *Frye* test therefore should be applied to the admission of testimony derived from the HGN test and its results. *State* v. *Borrelli,* supra, 227 Conn. 162–65.

We conclude, therefore, that as a precondition to the admission of testimony concerning HGN testing and results, the party introducing the testimony must establish, pursuant to *Frye,* the general acceptance of the HGN test. We note that the state did not meet this burden at trial, and that the state conceded at oral argument that it had presented no evidence at trial concerning the underlying scientific principles or the general acceptance of HGN testing. We conclude, therefore, that the trial court should have applied the *Frye* test. Because it did not, the trial court abused its discretion in admitting the evidence in the absence of a showing that the HGN test and its results met the criteria set forth in *Frye.* We further note that our holding does not obviate the necessity, however, of also laying a proper foundation with regard to the qualifications of the individual administering the test and the procedures followed in conducting the test before the admission of the evidence.

C

HARMLESS ERROR

Although we conclude that the trial court improperly failed to determine whether the HGN test and its

results met the criteria for the admission of testimony derived from scientific evidence set forth in *Frye*, our inquiry is not complete. We must also determine whether the trial court's failure was harmless in light of the other evidence presented at trial. " 'It is a fundamental rule of appellate review of evidentiary rulings that if error is not of constitutional dimensions, an appellant has the burden of establishing that there has been an erroneous ruling which was probably harmful to him.' *State* v. *Vitale,* 197 Conn. 396, 403, 497 A.2d 956 (1985). The question is whether the claimed erroneous action of the trial court is likely to have affected the result of the trial. *State* v. *Brown,* 199 Conn. 14, 25, 505 A.2d 690 (1986); *State* v. *Gonzales,* 196 Conn. 115, 119, 491 A.2d 1067 (1985)." *State* v. *Torrice,* 20 Conn. App. 75, 91, 564 A.2d 330, cert. denied, 213 Conn. 809, 568 A.2d 794 (1989). We further note that our inquiry focuses on the impact of the improperly introduced evidence on the jurors' perceptions and understanding of the other evidence presented in the case, rather than an analysis of the sufficiency of the remaining evidence to uphold the conviction in the absence of the admission of the evidence concerning the HGN test and its results. See *Swenson* v. *Sawoska,* 215 Conn. 148, 152–53, 575 A.2d 206 (1990).

The following facts are necessary for a review of this issue. Roland observed the defendant pass a stop sign. Roland testified that when he approached the defendant, the defendant's breath smelled strongly of alcohol, his eyes were bloodshot, his clothes were disheveled, he was swaying back and forth, and his speech was slow. Dunn testified that prior to the administration of the field sobriety tests, the defendant had a difficult time standing up, he was staggering, his face was flushed, his breath smelled strongly of alcohol, and he was slow to comprehend various instructions. It is undisputed that the defendant had consumed four mixed drinks during the course of the evening.

Roland administered three field sobriety tests, and the defendant failed each test. He was unable to recite the alphabet, to stand on one leg for a thirty count, or to walk a straight line, heel to toe, for ten steps, to pivot and to return. Dunn administered the HGN test and stated, in essence, that the defendant had failed each of the three portions of the HGN test.

Roland stated that, on the basis of his training and experience and observations, he formed an opinion as to the sobriety of the defendant. The defendant's performance on the field sobriety tests, as well as the odor of alcohol on his breath, his personal appearance, his slow response to questions and directions, and his operation of the vehicle led Roland to conclude that the defendant was intoxicated. Dunn stated that on the basis of his training, experience and observations, which included the defendant's performance on all of the field sobriety tests, the defendant was "well above the legal limit of intoxication . . . ."

The jury heard the officers' observations of the defendant prior to the administration of the field sobriety test, as well as the results of three field sobriety tests, independent of the results of the HGN test. The admission of the testimony concerning the HGN test and its results did not hinder the jury's ability to assess independently the weight and credibility to be given to each of the three field sobriety tests and the officers' observations. We cannot conclude, therefore, that the jury's perceptions of the other evidence presented in this case, such as the defendant's consuming four mixed drinks, his failing to pass three other field sobriety tests, and his demeanor and appearance, were so affected by the improperly admitted testimony concerning the HGN test and results, that it is likely that the result of the trial would have been different in the absence of the HGN test.

## II

The defendant further claims that the trial court improperly instructed the jury with regard to consciousness of guilt flowing from his refusal to submit to a breath test.[11] The defendant took exception to the instruction on the factual ground that there "was no evidence that the breath testing machine at the Jewett City police department was functional and operational."[12] The defendant claimed that the instruction

[11] The trial court instructed the jury as follows: "Now on the sobriety test refusal, let me instruct you relating to the consciousness of guilt. In this case the state is claiming that certain conduct on the part of the defendant constitutes consciousness of guilt.

"Let me tell you about the law on that subject. Whenever a person is on trial for a criminal offense, it is proper to show that person's conduct subsequent to the alleged offense which may fairly have been influenced by the criminal act, the manner in which the defendant conducted himself may also be shown. The person's conduct may be shown because such conduct might tend to show a guilty connection between the defendant and the crime charged. The state of mind which is characterized as a guilty conscience or consciousness of guilt, is relevant evidence that the person is indeed guilty.

"In this particular case, when a defendant is charged with a violation of [General Statutes] § 14-227a, it is permissible for the state to present evidence that the defendant was offered and refused a breath test after he had been made aware of the nature of the test and the effect of his refusal.

"Evidence of the defendant's refusal to take a breath test has been submitted in this case. If you find that the defendant refused to take a breath test after having been made aware of the nature of the test, and the effect of the refusal, I instruct you that such refusal, although admissible on the question of consciousness of guilt, is not sufficient standing alone and by itself, to establish the defendant's guilt. Such refusal, however, is one fact which, if proved, may be considered by the jury in light of all the other facts found to be proven in deciding the question of whether the defendant is guilty or not guilty.

"It is up to you as judges of the facts to decide whether certain conduct of the defendant claimed by the state was proven and then, if so, whether that reflects a consciousness of guilt and to give to it the weight which you think it is entitled to receive under the circumstances."

[12] The complete text of the defendant's exception is as follows: "The exception is to the consciousness of guilt and the negative inference charge flowing from [the defendant's] refusal. The ground—the factual grounds are that—

violated his due process rights to a fair trial pursuant to article first, § 8, of the Connecticut constitution. On appeal, the defendant launches a twofold attack. He contends that his refusal to submit to a breath test does not trigger a consciousness of guilt instruction. He also claims that the instruction was inappropriate absent proof that the machine was operational.

## A

The defendant contends that the refusal to submit to a breath test does not trigger the consciousness of guilt instruction set forth in General Statutes § 14-227a (f). Section 14-227a (f) provides that in prosecutions pursuant to § 14-227a (a), "the court shall instruct the jury as to any inference that may or may not be drawn from the defendant's refusal to submit to a blood, breath or urine test." The defendant did not properly preserve this issue at trial. Practice Book § 852.[13] His exception to the instruction related specifically to the fact that the trial court did not require that the state prove that the breath testing machine was operational. He did not claim that § 14-227a (f) did not provide for a consciousness of guilt instruction.

was that there was not evidence that the breath testing machine at the Jewett City police department was functional and operational. And I'm trying to carve out maybe a little new ground here in the law, and I'm suggesting that would be needed as a predicate before the consciousness of guilt and negative inference charge that Your Honor gave would be appropriate.

"And on behalf of that, I would just cite the Connecticut constitution, article first, § 8, and the due process rights to a fair trial."

[13] Practice Book § 852 provides: "The supreme court shall not be bound to consider error as to the giving of, or the failure to give, an instruction unless the matter is covered by a written request to charge or exception has been taken by the party appealing immediately after the charge is delivered. Counsel taking the exception shall state distinctly the matter objected to and the ground of objection. Upon request, opportunity shall be given to present the exception out of the hearing of the jury."

The defendant, however, attempts to characterize this unpreserved claim as constitutional in nature, thus implicating this court's power of review pursuant to *State* v. *Golding,* 213 Conn. 233, 567 A.2d 823 (1989), and *State* v. *Evans,* 165 Conn. 61, 327 A.2d 576 (1973). In *State* v. *Golding,* supra, 239–40, our Supreme Court provided that "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail."

Here, the claim fails under the second prong of *Golding.* Consciousness of guilt instructions, which permit, but do not mandate, an inference of a guilty conscience, are evidentiary rather than constitutional in nature. *State* v. *Smith,* 219 Conn. 160, 165–66, 592 A.2d 382 (1991); see also *State* v. *Adams,* 225 Conn. 270, 289–90, 623 A.2d 42 (1993). We, therefore, decline to review this unpreserved claim.

## B

The defendant also alleges that the legislature intended that the state prove that the breath testing machine was operational in order to trigger a consciousness of guilt instruction. "To determine the intent of the legislature, we first consider whether the statutory language 'yields a plain and unambiguous resolution.' . . . 'If the words are clear and unambiguous, "it is assumed that [they] express the intention of the legislature" . . . and we need inquire no fur-

ther.' . . ." (Citations omitted.) *State* v. *Mattioli,* 210 Conn. 573, 576, 556 A. 2d 584 (1989). "As we have stated in numerous other cases, 'it is not the province of a court to supply what the legislature chose to omit. The legislature is supreme in the area of legislation, and courts must apply statutory enactments according to their plain terms.' " *Glastonbury Co.* v. *Gillies,* 209 Conn. 175, 181, 550 A.2d 8 (1988).

The legislature did not condition the instruction on proof that the breath testing machine was operational, and we will not read such a requirement into the statute.[14] The defendant claims, however, that in the absence of proof that the machine was operational, the trial court's instruction violated his due process rights to a fair trial pursuant to article first, § 8, of the Connecticut constitution.[15] The defendant provides no citations or analysis of case law to support his claim. Because this issue is inadequately briefed, we decline to review this question. *State* v. *Tweedy,* 219 Conn. 489, 510 n.17, 594 A.2d 906 (1991).

The judgment is affirmed.

In this opinion the other judges concurred.

---

[14] General Statutes § 14-227a (f) is readily distinguishable from General Statutes § 14-227a (c) (4), in which the legislature specifically requires that the state prove that the breath testing machine was operational prior to the introduction of the results of the test into evidence.

[15] Article first, § 8, of the Connecticut constitution provides in pertinent part: "In all criminal prosecutions . . . [n]o person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law . . . ."