753 A.2d 1240 (2000)
332 N.J. Super. 564
STATE of New Jersey, Plaintiff,
v.
Salvatore MAIDA, Defendant.
Superior Court of New Jersey, Law Division, Middlesex County.
Decided January 13, 2000.
*1241 Kenneth Labrato, for the State of New Jersey.
Paul Sica, New Brunswick, for the defendant.
RODRIGUEZ, J.S.C.
In a prosecution for Driving While Under The Influence (DUI) of alcohol, the defense appealed a guilty verdict of the East Brunswick Municipal Court. The defendant contends that the Coordinator's Certificate is not sufficient to carry the burden of proof as to the accuracy of the breathalyzer; the Horizontal Gaze Nystagmus (HGN) test is not scientifically reliable *1242 and is not admissible; the clue point system testimony is not scientifically reliable and is not admissible; and the failure of the police to videotape the defendant at headquarters is a violation of due process and the prosecution should be dismissed.
This court holds that the Coordinator's Certificate is sufficient to carry the burden of proof as to the accuracy of the breathalyzer; the HGN test is scientifically reliable and admissible as evidence of intoxication; however, the test is not conclusive proof of intoxication, but is a factor to be considered in determining whether someone is intoxicated; the clue point system testimony is admissible since it is nothing more than the Police Officer's observations of the behavior and demeanor of the defendant; and the failure of the police to videotape the defendant at headquarters is not a violation of due process.
This matter arises from the East Brunswick Municipal Court's order convicting the defendant, Salvatore Maida, for driving under the influence in violation of N.J.S.A. 39:4-50, careless driving in violation of N.J.S.A. 39:4-97, and for operating a vehicle with an invalid inspection sticker. The careless driving charge was merged into the driving under the influence charge for sentencing purposes. The defendant's drivers license was suspended for six months and he was ordered to pay fines of $250, $30 court costs, $100 DWI surcharge, $50 VCCB, 12 hours of enrollment in an Intoxicated Driver Resource program. For the invalid inspection sticker the defendant was fined $21 and $21 court costs.
This matter stems from an incident that occurred on February 12, 1997, at approximately 2:30 am, when East Brunswick Patrolman James Conroy, while patrolling route 18, observed defendant changing lanes without signaling and almost striking the car in front of him, Officer Conroy testified that defendant in two occasions applied his brakes suddenly to avoid a collision with the car in front of him. Upon observing the traffic violation, Officer Conroy proceeded to follow the defendant and at some point he actually came close enough to the defendant to observe that the inspection sticker on the vehicle was expired. Officer Conroy stopped Mr. Maida shortly after observing the traffic violations. The Officer testified that when he approached the defendant to ask him for his driving credentials, he detected an odor of alcohol coming from inside the vehicle and when the defendant exited the vehicle, the Officer was able to smell an odor of alcohol on the defendant's breath. These observations prompted Officer Conroy to administer field sobriety tests.
Officer Conroy testified that he administered four field sobriety tests: first, the alcosensor test; second, the one leg stand test; third, the walk-turn test; and lastly, the Horizontal Gaze Nystagmus (HGN) test.[1] Regarding the HGN test, which records involuntary eye spasm indicative of alcohol intoxication, defendant obtained a maximum score of six clues, strongly suggesting that defendant might be under the influence of alcohol. On the walk and turn test, defendant had some trouble balancing and stepped off the line twice and missed the heel to toe aspect in the first *1243 nine steps. On the one-leg stand test, defendant put his foot down a total of three times. Regarding the Alcosensor test, which is a mechanical breath reading test, defendant's result was positive for the presence of alcohol. Based on defendant's performance on the four tests, Officer Conroy placed the defendant under arrest for driving under the influence and transported him to the East Brunswick Police Headquarters for a breathalyzer test. Twice the breathalyzer machine recorded that defendant blood alcohol concentration was .10% alcohol.
At trial, the defendant testified that prior to being stopped in East Brunswick by Officer Conroy, he had been up for 23 hours. He had completed a half a day of work and had spent a whole afternoon and evening with his friend in New York City where he attended the David Letterman show with his friend Murphy.
They arrived in New York City by train from New Brunswick around 3:30 p.m. and went to the All Star Café where defendant consumed his first beer that afternoon. After watching the Letterman show from 4:15 p.m. to 6:15 p.m., defendant and Murphy went to a bar right next door to order some beers. Defendant testified that he stopped drinking at around ten o'clock because Murphy who was the designated driver from the train station lost one of his contacts at around 9:30 p.m. Defendant testified that he had about a total of six beers that night, give or take a few, but only consumed five beers from 7:00 p.m. to 11:30 p.m. Murphy and the defendant testified that they left the bar between 11:00 to 11:30 p.m. and got on the train at around 1:20 a.m., finally getting to their car at around 2:30 a.m. When they got off the train at around 2:30 a.m., defendant took control of Murphy's car keys and drove southbound on Route 18 back to defendant's mother's house. He was eventually stopped by Officer Conroy in East Brunswick.
After hearing all the testimony, Municipal Judge James Hyland held that the State had proved beyond a reasonable doubt that the defendant was driving under the influence of alcohol. The Judge in making this ruling considered the following factors: First, the fact that the defendant admitted to drinking five to six beers between seven to eleven o' clock. Second, the Judge considered the credible testimony of Officer Conroy that he detected an odor of alcohol coming from the car and defendant's breath. Third, the Judge found credible the fact that Officer Conroy, who is qualified in administering field sobriety test, determined that the defendant failed the four field tests. In light of all this testimony, the Judge found that the defendant was intoxicated beyond a reasonable doubt. Additionally, Judge Hyland found the breathalyzer reading to be accurate and reliable and that the machine was in proper working order. Judge Hyland found that the HGN test was a relevant factor in determining whether or not the defendant was under the influence of alcohol
The basis of the defendant's appeal of his conviction is threefold. First, the defendant argues that the .10 Breathalyzer reading might not be accurate because the machine may not have been properly purged and calibrated. Second, the defendant argues that the HGN test is not a scientifically reliable indication of blood alcohol level, and, therefore, all reference to the HGN test as indication of defendant's intoxication should be excluded. Third, defendant argues that the clue point system applied by the officer in this case is also not scientifically reliable and therefore should be excluded. Lastly, he argues that the police should have videotaped the testing at headquarters and the failure to due so was a due process violation of his rights.
The first issue to address is whether the municipal court erred in admitting the results of the Breathalyzer tests administered after defendant's arrest. At trial, defendant's expert, Richard Saferstein, testified that the breathalyzer in this *1244 case did not render an accurate .10 finding because the simulator solution used to calibrate the breathalyzer may have been depleted due to overuse and the simulator solution may not have been properly purged from the machine during calibration. Apparently, Dr. Saferstein had used the same solution depletion argument in State v. Slinger, 281 N.J.Super. 538, 658 A.2d 1299 (App.Div.1995), and the Slinger court held that the coordinator's certificate of itself is sufficient to satisfy the State's burden of proving that the breathalyzer has been appropriately tested for accuracy. See State v. Slinger, 281 N.J.Super. 538, 542, 658 A.2d 1299 (App.Div.1995); see also State v. Benas, 281 N.J.Super. 251, 657 A.2d 445 (App.Div.1995) ("holding that the State need not prove that the simulator solution was itself tested to determine whether at the time of the issuance of the inspection certificate, the solution was of correct concentration."). Furthermore, in Romano v. Kimmelman, 96 N.J. 66, 82, 474 A.2d 1 (1984), the New Jersey Supreme Court held that model 900 breathalyzer is a scientifically accurate and reliable instrument for determining the content of blood alcohol. Breathalyzer results are admissible evidence of intoxication when (1) the breathalyzer instrument is in proper working order, (2) the test is administered by a qualified operator, and (3) the test is conducted in accordance with accepted procedures. Id. at 82, 474 A.2d 1.
Here, we have all three of the prerequisite elements needed to establish the reliability and admissibility of the breathalyzer results. First, according to the Breathalyzer certificate, the machine was in proper working order when the test was administered. Second, Officer Conroy, who administered the test, is a qualified operator. Third, The protocol filed and followed by Officer Conroy was proper under the statute. Therefore, I find that the breathalyzer readings in this case are reliable and admissible evidence of intoxication.
The second issue to address is whether the municipal court erred in admitting Officer Conroy's testimony regarding the results of the HGN test. The underlying issue here is whether or not the HGN test is sufficiently reliable to be admitted as scientific evidence of intoxication in a criminal trial. Before trial in the municipal court, the defendant asked for a Rule 104 hearing to require the State to establish the scientific reliability of the HGN test, but the trial court denied the hearing. Generally, the party offering results of a scientific test as evidence is required to show that the scientific technique has gained general acceptance within the scientific community. Romano v. Kimmelman, 96 N.J. 66, 474 A.2d 1 (1984); State v. Kelly, 97 N.J. 178, 478 A.2d 364 (1984); State v. Spann, 130 N.J. 484, 617 A.2d 247 (1993). There are three ways to show general acceptance within the scientific community of a particular procedure. (1) testimony of knowledgeable experts. (2) authoritative scientific literature. (3) persuasive judicial decision. Windmere, Inc. v. International Ins. Co., 105 N.J. 373, 522 A.2d 405 (1987).
In the trial de novo the State called Dr. Marcelline Burns to testify as to the validation studies she performed in the area of HGN testing. Her studies were to determine the reliability of the HGN tests. Dr. Burns testified that during the past few years she conducted a series of validation studies in conjunction with the National Highway Traffic Safety Administration (NHTSA), the United States Department of Transportation (USDOT), and the USDOT Battery. Specifically, the most recent study was conducted in San Diego, California. In this study, there was a 91% correct determination by the officers overall and a 94% correct determination by those officers who made an arrest. As a whole, the studies illustrated that the now Standardized Field Sobriety Tests are accurate for ascertaining the existence of alcohol in alleged drunk drivers.
*1245 To support the State's contention that Standard Field Sobriety Tests (SFSTs), specifically the HGN test, is scientifically accepted, the State also presented the testimony of Dr. Jack Richman from the New England Eye Institute. Dr. Richman has been qualified as an expert in the area of the relationship of alcohol and eye movement at least fifteen (15) times in over a half a dozen states in the country. Furthermore, Dr. Richman testified that he himself used HGN at roadside roadblocks with the police. Dr. Richman has performed more than thirty (30) years of clinical research on the issue. He is an eminent expert and was qualified as such. He testified that he performed his own study and found HGN to be 87% accurate. Moreover, he stated that a study in Ohio illustrated that when administering the HGN test, if all six (6) indicators are present, there is a 99% accuracy rate.
Dr. Richman also testified as to the articles, papers, and resolutions which support the HGN test within the scientific community. He asserted that the HGN test is accepted within the medical community as well, because the test is used by doctors and interns in emergency and examination rooms. Dr. Richman testified that he knows of no study which states that the HGN test is not reliable.
A proponent of scientific evidence must show that the procedures or experiments are generally accepted in their field. Frye v. United States, 293 F. 1013 (D.C.Cir.1923). The testimony presented by Dr. Burns and Dr. Richman establishes to this Court's satisfaction that the HGN test is an accepted procedure in its field. Therefore, based on the testimony of Dr. Burns and Dr. Richmond, I find that the HGN test is generally accepted by the scientific community as a reliable scientific indicator of likely intoxication and the trial court did not err in admitting Officer Conroy's testimony regarding the results of the HGN test.
It should also be noted that even though no New Jersey Court has addressed the scientific reliability of the HGN test, other jurisdictions have accepted the HGN test as scientific evidence.
In this case, we do have a significant number of persuasive judicial decisions from other jurisdictions that accept the validity of the HGN test as an indicator of intoxication. See State v. Superior Court, 149 Ariz. 269, 718 P.2d 171 (1986); see also State v. Taylor, 694 A.2d 907 (Me.1997) (finding that the horizontal nystagmus test is sufficiently reliable to be admitted as evidence in future cases); State v. Merritt, 36 Conn.App. 76, 647 A.2d 1021 (1994); People v. Kirk, 289 III.App.3d 326, 224 Ill.Dec. 452, 681 N.E.2d 1073 (1997); People v. Leahy, 8 Cal.4th 587, 34 Cal.Rptr.2d 663, 882 P.2d 321 (1994). According to State v. Harvey, 151 N.J. 117, 170, 699 A.2d 596 (1997), general acceptance can be established if there are sufficient judicial opinions from other jurisdictions indicating that the scientific test is reliable. Id. at 184, 699 A.2d 596. (finding that admission of the polymarker test in other jurisdictions supports their conclusion that the trial court correctly admitted the evidence). Certainly, in the present case, the State and the lower court could rely on judicial opinions of other jurisdictions to prove the general acceptance of the HGN test as scientific evidence.
One third of the States in this country have specifically accepted the reliability of the test, one fewer than half of those states have judicially noticed the test to be reliable and no jurisdiction has rejected the validity of the test. Even though there are studies that criticize the reliability of the HGN test, according to Harvey:
General acceptance ... does not require complete agreement over the accuracy of the test or the exclusion of the possibility of error. Neither is it necessary to demonstrate that the techniques, methodology, and procedures are infallible. Nor is it necessary that acceptance within the scientific community be unanimous. Every scientific theory has its *1246 detractors. [T]he State's burden [,rather,] is to prove that the ... test and the interpretation of its results are non-experimental, demonstrable techniques that the relevant scientific community widely, but perhaps not unanimously, accepts as reliable. Id. at 171, 699 A.2d 596.
eral acceptance does not require universal or unanimous acceptance from the scientific community, there is no reason why New Jersey should not accept the opinions of the courts of other jurisdictions that the HGN test is a valid indicator of likely intoxication.
However, it is also clear that the majority of jurisdictions that accepted the HGN test as scientific evidence only allowed the test and results as evidence of intoxication rather than conclusive proof of intoxication. State v. Merritt, 36 Conn.App. 76, 647 A.2d 1021 (1994). Clearly, in this case, the trial court did not deviate from the general standard set forth by other courts in other jurisdictions regarding the reliability of the HGN test and its proper use as one of the factors to be considered in determining intoxication.
In the instant case, Officer Conroy discovered all six indicators in the defendant's eyes when he administered the HGN test. Dr. Richman testified that, regardless of how an individual performs on the balance test, a person with .10% blood alcohol will reveal all six indicators when the HGN test is administered to them.
The third issue to address is whether the municipal court erred by accepting the clue point system applied by the Officer in this case. Defendant argues that the clue point system applied by the Officer in this case is also not scientifically reliable, and, therefore, should be excluded. According to Officer Conroy's testimony, the clue point system is just a formal way of translating the number of times the defendant faltered during a particular field sobriety test. There is absolutely no science involved in the clue point system unless counting is considered a scientific technique. In this case, when Officer Conroy spoke about clues he simply meant how many mistakes defendant made in each test. What is decisive in sobriety tests is how the defendant behaves and whether or not he behaves like an intoxicated person. The clue point is nothing more than the Officer's observations of the defendant's demeanor, from which common sense inferences are drawn as to the condition of the defendant. Therefore, I find that the trial court did not err in admitting officer Conroy's testimony regarding the clue point system.
The final issue to deal with is whether the lack of videotaping at Police Headquarter in this case deprives the defendant of his right to due process under the law. In State v. Gordon, 261 N.J.Super. 462, 619 A.2d 259 (App.Div.1993), the court held that "there is no duty on part of police to create evidence by videotaping suspected drunk drivers." Id. at 462, 619 A.2d 259. Furthermore, according to R. 3:13-3, "the prosecutor is only obligated to turn over items with the possession, custody or control of the prosecuting attorney." R. 3:13-3(c)(3), (5), (7), (8). Therefore, in light of the criminal discovery rule and State v. Gordon, the police department in this case had no duty to videotape the defendant at police headquarters.
In light of these determinations and a close review of the record below, the defendant is guilty of violating N.J.S.A. 39:4-50. The penalties imposed are confirmed.
NOTES
[1] Nystagmus is an involuntary jerking of the eyeball. State v. Superior Court, 149 Ariz. 269, 718 P.2d 171, 173 (1986). The jerking may be aggravated by central nervous system depressants such as alcohol or barbiturates. Id. (citing THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 1980 (14th ed.1982)). Horizontal gaze nystagmus is the inability of the eyes to maintain visual fixation as they are turned to the side. In the HGN test the driver is asked to cover one eye and focus the other on an object (usually a pen) held by the officer at the driver's eye level. Id. As the officer moves the object gradually out of the driver's field of vision toward his ear, he watches the driver's eyeball to detect involuntary jerking. Id. The test is repeated with the other eye. Id. By observing (1) the inability of each eye to track movement smoothly, (2) pronounced nystagmus at maximum deviation and (3) onset of the nystagmus at an angle less than 45 degrees in relation to the center point, the officer can estimate whether the driver's blood alcohol content (BAC) exceeds the legal limit of .10 percent. Id.