**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0575-14T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

CLYDE GAYLE,

    Defendant-Appellant.

_____

Submitted February 28, 2017 — Decided March 17, 2017

Before Judges Yannotti and Gilson.

On appeal from Superior Court of New Jersey,
Law Division, Camden County, Indictment No.
12-08-2273.

Law Offices of Edward J. Crisonino, attorneys
for appellant (Edward J. Crisonino, on the
brief).

Mary Eva Colalillo, Camden County Prosecutor,
attorney for respondent (Jason Magid,
Assistant Prosecutor, of counsel and on the
brief).

PER CURIAM

    Defendant was tried before a jury and found guilty of certain

persons not to possess a firearm, contrary to N.J.S.A. 2C:39-7(b),

and other weapons-related offenses. The trial judge sentenced defendant on the certain persons offense to an extended term of fourteen years of incarceration, with seven years of parole ineligibility, and imposed concurrent sentences on the other offenses. Defendant appeals from the judgment of conviction dated August 22, 2014. We affirm.

I.

Defendant was charged under a Camden County indictment with second-degree unlawful possession of a weapon, specifically, a .38 caliber handgun, N.J.S.A. 2C:39-5(b) (count one); fourth-degree unlawful possession of hollow-nose bullets, N.J.S.A. 2C:39-3(f) (count two); and second-degree certain persons not to possess weapons, N.J.S.A. 2C:39-7(b) (count three). Defendant filed a motion to suppress evidence obtained from a car in which defendant was a back-seat passenger, and the trial court conducted an evidentiary hearing on the motion.

At the hearing, Sergeant Raphael Thornton of the Camden County Police Department, who for the prior seventeen years worked for the City of Camden's Police Department (CCPD),[1] testified that in March 2012, he was assigned to the CCPD's Real Time Tactical Operations Command Center, which is the department's technological

_____

[1] The CCPD was replaced by the Camden County Police Department on January 1, 2013. Redd v. Bowman, 223 N.J. 87, 102 (2015).

arm. Thornton testified that on March 24, 2012, at approximately 4:30 a.m., he was conducting a virtual patrol using a video camera located in an area around Louis and Sycamore Streets. Thornton observed four individuals talking to a male, who was later identified as defendant. Thornton described defendant as an African-American male, who was wearing a white t-shirt and dark jeans.

Thornton said defendant was on the porch of a residence speaking with four persons. Thornton observed two of the four individuals walk away, and a man and a woman remained. Defendant left the porch and approached the two individuals. Thornton testified that defendant and the male began having a very violent argument.

Thornton said he observed the woman try to grab the man's arm in an effort to get him to leave, but he evaded her and she walked away. Defendant and the man continued to argue. The woman returned and again grabbed the man. They both walked away, out of the range of the camera.

Then, according to Thornton, ShotSpotter, the CCPD's gunshot-alert system, was activated. Thornton explained that ShotSpotter is a system that the military developed. He said the system

> was used for snipers in Iraq to pinpoint a
> sniper. We use it now in the city to pinpoint
> firearms. It lets us pinpoint or close down

an area where a firearm is being fired. It's four acoustic systems set up throughout the city and they intertwine. And when a firearm is fired, [ShotSpotter will] pinpoint it by echoing the sounds off the acoustic systems.

Thornton stated that ShotSpotter provides the address where a shot was fired, whether it was fired in the back or front yard of a residence, or whether the shot came directly out of a house. Defense counsel did not object to Thornton's testimony regarding ShotSpotter.

Thornton further testified that he then observed defendant run back onto the porch and into the house. Several seconds later, defendant exited the house with several other individuals. As defendant exited the house, Thornton noticed that defendant's hand was on the right-side of the waistband of his pants. Thornton testified, "it looked like he was positioning something or holding something. Once he got comfortable, he took his hand off his right waistband and began to walk."

Thornton stated that when defendant "got to the foot of the steps on the sidewalk, he gave another check[.]" Defendant then walked toward a black Saturn. Thornton suspected that the unidentified male and/or woman had fired a gun at defendant, which prompted defendant to go into the house and retrieve a gun for his own protection.

4

Thornton believed that defendant was in possession of a handgun, based upon the way defendant walked and adjusted his hand. Thornton thought defendant's movements indicated he was positioning a firearm in the waistband of his pants. Thornton directed officers in the area to respond to the scene. He gave the officers a description of defendant and told them defendant may be in possession of a firearm.

Officer Harry Welch of the CCPD immediately responded to the area near the intersection of Haddon Avenue and Sycamore Street. He observed an African-American male in a white t-shirt entering the black Saturn. Welch identified defendant as the person he observed. Welch testified that the area was well-lit with streetlights, and he had a clear view of defendant.

As Welch approached the Saturn, the occupants of the vehicle noticed him coming towards them. Welch observed defendant sitting in the backseat of the car behind the driver. He testified, "I saw the defendant scurrying, like, bending over, like, grumbling [sic] about, you know, just doing something behind the backseat of the driver's side."

Welch ordered the occupants to show their hands. Other CCPD officers arrived at the scene, and they began to ask the occupants to exit the vehicle, one at a time. Defendant got out of the car, after the officers instructed him to do so. As the occupants exited

the Saturn, one of the officers saw a weapon underneath the driver's seat.

The officer told Welch he saw a weapon. After Welch secured one of the occupants, he looked and noticed the weapon. He testified, "I know what a handgun looks like. I could see the actual gun. You could see the gun underneath the seat. It wasn't completely under the seat, but you could see it." After the occupants were secure, Welch seized the weapon. The officers secured the gun and determined that it contained hollow-point bullets.

After the officers testified, a video recording of the stop and seizure of the weapon was played. The judge observed that it was not the best of recordings. The judge said he could see a "flurry of activity," but he could not determine whether there was anything in the record that was inconsistent with the officers' testimony.

The judge then placed his decision on the record. The judge noted that the officers had acted in "a fast-moving situation" in which there were reports of a gun and gunfire. The judge stated this was "the most lethal emergent situation that the police face on the criminal front."

The judge rejected defendant's contention that the officers made the investigatory stop based solely on the report of gunfire.

A-0575-14T4

The judge noted that the officers also had acted on the basis of their observations of defendant. The judge pointed out that the officers had observed defendant being involved in and/or around a shooting.

The judge found that defendant was conducting himself in a manner consistent with an individual who possessed a handgun. The judge also noted that defendant was only wearing a t-shirt. The judge observed that this was unusual attire for an early-March morning, which is typically a cold time of the year. The judge said one of the officers saw defendant engage in suspicious conduct inside the car.

The judge concluded that the investigatory stop was valid because the officers had reasonable suspicion of illegal conduct. The judge also concluded that the officers validly seized the weapon pursuant to the plain view exception to the warrant requirement. Accordingly, the judge denied defendant's motion to suppress the evidence found in the vehicle.

Thereafter, defendant was tried before a jury. At the trial, Thornton and Welch presented testimony that was essentially the same as the testimony they gave at the suppression hearing. On cross-examination, Welch acknowledged receiving a call informing him that shots had been fired in the area. The following colloquy ensued between defense counsel and Welch:

Q. And you're aware of something called ShotSpotter, is that right?

A. Yes.

Q. And ShotSpotter, it pinpoints where a shot was fired, is that right?

A. It is supposed to.

Q. Supposed to, okay. And you testified that it was the area — the area that you were told was the area of Haddon and Sycamore, is that right? So you were dispatched to that area because there was a shot fired?

A. I was dispatched to that area, yes.

Q. Okay. And you were dispatched to that area, but were you told where the ShotSpotter went off?

A. Negative.

In addition, Thornton testified that in March 2012, he was assigned to a unit that conducts virtual patrols of areas of the city, using approximately fifty surveillance cameras and ShotSpotter. Thornton was asked to explain ShotSpotter. He testified that ShotSpotter

is a system developed by the military. It was originally developed to help our soldiers combat snipers. It basically is a series of microphones that triangulate soundwaves and give you a grid coordinate. And if you can imagine soundwaves intercepting in the sky, and [it will] give you a longitude and latitude of where that sound wave came from.

Thornton added that ShotSpotter is "designed to pick up gunshots." He said the system is capable of pinpointing the place where a shot was fired, within a city block.

Certain stipulations and evidence were then placed on the record. They included a ShotSpotter report; an affidavit from the State Police indicating that defendant did not have a permit for the weapon; documents pertaining to the Saturn; a report from the State Police indicating that no identifiable fingerprints had been found on the gun or the ammunition magazine; and a State Police affidavit stating that the handgun was "safely capable of firing."

Defendant elected not to testify, and he did not call any witnesses on his behalf.

The jury found defendant guilty on all counts of the indictment. Thereafter, the court granted the State's motion for imposition of an extended term. The court then sentenced defendant on count three (certain persons not to possess weapons) to an extended term of fourteen years of incarceration, with seven years of parole ineligibility. The court imposed concurrent sentences on the other counts, and entered a judgment of conviction dated August 22, 2014. Defendant's appeal followed.

On appeal, defendant argues:

> POINT ONE
> THE TESTIMONY CONCERNING THE SHOTSPOTTER
> SHOULD NOT HAVE BEEN ADMITTED AT TRIAL OR AT

A-0575-14T4

THE [HEARING ON THE] SUPPRESSION MOTION (NOT RAISED BELOW).

POINT TWO
THE DEFENDANT'S SUPPRESSION MOTION SHOULD HAVE BEEN GRANTED.

POINT THREE
THE DEFENDANT SHOULD NOT HAVE BEEN SENTENCED TO AN EXTENDED TERM.

II.

We turn first to defendant's argument that the testimony about ShotSpotter should not have been admitted at the suppression hearing or at the trial because Thornton was not qualified as an expert witness, and there was never a hearing to determine whether the ShotSpotter system is scientifically reliable.

As we noted previously, defendant did not object to Thornton's testimony regarding ShotSpotter, either at the suppression hearing or at trial. Moreover, at the trial, defendant agreed to the admission of the ShotSpotter report. We therefore consider whether the admission of the testimony regarding ShotSpotter constituted plain error, that is, an error "clearly capable of producing an unjust result." R. 2:10-2.

Here, the officers conducted an investigatory stop of defendant, which is permitted if the officer has reasonable and particularized suspicion that an individual has engaged in, or was about to engage in, criminal activity. Terry v. Ohio, 392 U.S. 1,

10

21, 88 S. Ct. 1868, 1880, 20 L. Ed. 2d 889, 906 (1968). In assessing whether the officer had reasonable suspicion, the court must consider the totality of the circumstances. State v. Stovall, 170 N.J. 346, 356 (2002) (citing Terry, supra, 392 U.S. at 21, 88 S. Ct. at 1880, 20 L. Ed. 2d at 906).

The admission of the testimony regarding ShotSpotter at the suppression hearing was not erroneous. The State was not required to have Thornton qualified as an expert. His testimony about ShotSpotter was largely factual. His opinion that ShotSpotter produces reliable results was proper lay opinion testimony under N.J.R.E. 701. It was rationally based on his own perceptions.

Moreover, the State was not required to establish that testimony about ShotSpotter was scientifically reliable for admission under N.J.R.E. 702. The State only presented the testimony to show the source of Thornton's knowledge that a shot had been fired at approximately 4:30 a.m. on March 24, 2012, in the area of Louis and Sycamore Streets in the city.

As noted previously, Thornton testified that ShotSpotter is a reliable means for detecting gunshots and their location. Thornton's testimony about ShotSpotter provided a sufficient foundation for its admission on the question of whether Thornton reasonably believed a shot had been fired in the area under surveillance.

11

Therefore, the testimony regarding ShotSpotter was admissible at the suppression hearing. See State v. Doriguzzi, 334 N.J. Super. 530, 546 (App. Div. 2000) (noting that the horizontal gaze nystagmus test is not sufficiently reliable for admission as proof the defendant was driving under the influence of alcohol, which was "qualitatively different" from admitting the evidence to establish probable cause to arrest).

We also reject defendant's contention that the admission at trial of the ShotSpotter testimony constituted plain error. Even if we agreed that testimony about ShotSpotter should not have been admitted unless the State established that the ShotSpotter system is scientifically reliable, the admission of the testimony was not "clearly capable of producing an unjust result." R. 2:10-2.

Defendant was not charged with shooting the weapon. He was tried on charges related to the possession of a handgun and hollow-point bullets. The ShotSpotter testimony was not presented as proof of any of the elements of the charged offenses.

Rather, the testimony regarding ShotSpotter was background information, which had no direct bearing on whether defendant was guilty of the charged offenses. The testimony was only presented to show the reasons the officers stopped defendant, and to explain how they came to seize the weapon and the ammunition. Furthermore, even without the evidence regarding ShotSpotter, the State had

12

presented more than enough evidence to show that defendant was guilty of the charged offenses, beyond a reasonable doubt.

Thus, even if the admission of the ShotSpotter testimony was erroneous, the error was harmless. See State v. Macon, 57 N.J. 325, 336 (1971) (noting that an error is harmless if it does not "raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached").

## III.

Next, defendant argues that the trial court erred by denying his motion to suppress the firearm and the hollow-point bullets seized from the vehicle. Defendant again contends that the testimony regarding ShotSpotter should not have been admitted at the suppression hearing. He also argues that, without such evidence, Welch did not have reasonable and articulable suspicion of criminal activity to conduct the investigatory stop, and the seizure of the firearm and ammunition was unlawful.

We are required to uphold the factual findings of the trial court on a suppression motion if "those findings are 'supported by sufficient credible evidence in the record.'" State v. Elders, 192 N.J. 224, 243 (2007) (citing State v. Locurto, 157 N.J. 463, 474 (1999)). We must defer to the trial court's findings "which are substantially influenced by [the court's] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a

reviewing court cannot enjoy." Id. at 244 (quoting State v. Johnson, 42 N.J. 146, 161 (1964)).

As stated previously, a law enforcement officer may conduct an investigatory stop where the officer has reasonable and articulable suspicion that the person has engaged or was about to engage in unlawful activity. Terry, supra, 392 U.S. at 21, 88 S. Ct. at 1880, 20 L. Ed. 2d at 906. In deciding whether the officer had reasonable suspicion, the court considers the totality of the circumstances. Stovall, supra, 170 N.J. at 356-57 (2002) (citing Terry, supra, 392 U.S. at 21, 88 S. Ct. at 1880, 20 L. Ed. 2d at 906).

Here, there is sufficient credible evidence in the record to support the trial court's determination that the officers had reasonable articulable suspicion that defendant had engaged in, or was about to engage in, criminal activity. As we have concluded, the testimony regarding ShotSpotter was admissible at the suppression hearing. Thornton determined, based on the activation of the ShotSpotter system, that a shot had been fired from a gun in the area under surveillance.

Using the surveillance camera, Thornton observed defendant leave a residence and engage in actions consistent with an individual who is in possession of a handgun. Thornton testified that he had reached this conclusion based on the way defendant

14

walked out of the house, the way defendant had positioned his hand, and the belief that defendant had "just been fired at." Thornton thought defendant may have retrieved the weapon for his own protection, because defendant did not know if the individual who fired the shot at him would return.

Furthermore, Thornton dispatched Welch to the area of Haddon Avenue and Sycamore Street, and he provided Welch with a description of defendant. Thornton described the clothes defendant was wearing, including the white t-shirt. Welch testified that he observed defendant enter a black Saturn. Defendant was sitting behind the driver in the rear passenger seat. Welch saw defendant "scurrying," "bending over," and "doing something behind the backseat of the driver's side." He was engaging in actions Welch thought suspicious.

The evidence therefore supports the trial court's finding that, based on the totality of the circumstances, the officers had reasonable and articulable suspicion that defendant had engaged in, or was about to engage in, criminal activity. There is sufficient credible evidence in the record to support the trial court's determination that the investigatory stop was proper.

We note that defendant does not argue that the seizure of the handgun was unlawful. In any event, the testimony presented at the hearing shows that the weapon was lawfully seized pursuant to the

plain view doctrine. See State v. Bruzzese, 94 N.J. 210, 236 (1983) (citing Coolidge v. New Hampshire, 403 U.S. 443, 465-70, 91 S. Ct. 2022, 2037-40, 29 L. Ed. 2d 564, 582-84 (1971)).

## IV.

Defendant further argues that he should not have been sentenced to an extended term as a persistent offender pursuant to N.J.S.A. 2C:44-3(a). He contends the trial judge failed to undertake the analysis required to determine if an extended-term sentence is appropriate.

An appellate court's review of the trial courts' "sentencing decisions is relatively narrow and is governed by an abuse of discretion standard." State v. Blackmon, 202 N.J. 283, 297 (2010). We consider "whether the trial court has made findings of fact that are grounded in competent, reasonably credible evidence and whether the 'factfinder [has] appl[ied] correct legal principles in exercising its discretion.'" Ibid. (alterations in original) (quoting State v. Roth, 95 N.J. 334, 363 (1984)).

We may not set aside a trial court's sentence unless (1) the trial court did not follow the sentencing guidelines; (2) the court's findings of aggravating and mitigating factors were not based upon sufficient credible evidence in the record; or (3) the court's application of the sentencing guidelines to the facts of the case "shock[s] the judicial conscience." State v. Bolvito, 217

N.J. 221, 228 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

Here, the trial judge found aggravating factors three, N.J.S.A. 2C:44-1(a)(3) (risk that defendant will re-offend); six, N.J.S.A. 2C:44-1(a)(6) (defendant's prior criminal record and the seriousness of the offenses of which he has been convicted); and nine, N.J.S.A. 2C:44-1(a)(9) (need to deter defendant and others from violating the law). The judge observed that defendant had four prior Superior Court convictions and two previous municipal court convictions. The judge found no mitigating factors.

The judge also found that, based on his prior criminal convictions, defendant was eligible for an extended term pursuant to N.J.S.A. 2C:44-3(a) as a persistent offender. The judge imposed an extended term of fourteen years of incarceration on count three (second-degree certain persons not to possess a weapon), with a seven-year period of parole ineligibility. The judge imposed concurrent sentences on the other counts.

On appeal, defendant argues that, in deciding to impose the extended-term sentence, the trial judge failed to engage in the analysis prescribed in State v. Dunbar, 108 N.J. 80 (1987). Dunbar requires the sentencing judge to determine whether the defendant is eligible for an extended term; decide whether an extended term should be imposed; weigh the aggravating and mitigating factors

to determine the base term of the sentence; and decide whether to impose a period of parole ineligibility. <u>Dunbar</u>, <u>supra</u>, 108 <u>N.J.</u> at 89.

Here, the trial judge provided sufficient reasons for the imposition of the extended term. The judge's findings of aggravating factors were supported by sufficient credible evidence, including defendant's prior criminal record. Moreover, the judge weighed the aggravating factors and lack of any mitigating factors in determining the base term of the sentence. The judge also found that a seven-year period of parole ineligibility was warranted. Simply put, the judge performed the required analysis when imposing the extended-term sentence.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0575-14T4